The next case call for argument is First Clover Leaf Bank v. Bank of Edwardsville and this one is 512-0441. Counsel, whenever you're ready, you may proceed. May I please report? Like I said, it's a day job to do all over again. We're back. And I did say we would take a break between the cases. So, my name is Tommy Serza and I represent the appellants in this case as well. The same parties. Some of the issues are very similar, if not the same. Some of the issues are a little bit different. This case is the foreclosure action. The original complaint in this case was filed based upon the November 21, 2003 mortgage. It was filed December 9, 2008. The constructive trust case was filed six months previous to that. Interestingly, the initial complaint stated that the basis for the fault was that the gardeners had lied by disbursing or had breached the mortgage by getting rid of the property without permission of the bank. Well, it was interesting on that because the mortgage document itself lists the Bank of Edwardsville trustee. It doesn't list the gardener as the borrower because it's the owner. So, it was an interesting basis for that. Well, the long story short, the other lien holders got involved. The first counsel of the bank, they filed a counterclaim concerning their property as well as the basis was the failure to take taxes. No one was in dispute. The matter kept proceeding along. As you heard from the first argument this morning, it got a little interesting. I wasn't quite sure which counsel I was supposed to be communicating with in relation to First Cloverleaf Bank and the title company and everything. Well, the case went along, but what's pertinent here for the argument here as well, in summary, judgment was eventually granted in favor of First Counsel Bank. Judge Harrison then kind of listed where the parties stood in priority and then reserved the issue or granted the summary judgment in order to sale but then reserved the issue of priorities. A lot of issues got resolved and everything, and it came down to just us and First Cloverleaf Bank here. Okay, so, and we got to the issue of, at some point in time, First Cloverleaf Bank actually then filed a motion to intervene as a third-party planner. So they were both plaintiff and third-party planner to, and they were also defendant in the case, or counter-defendant, I should say, because they were asserting in their plaintiff's case, they were asserting a November 21, 2003 mortgage, which the judge found as an equitable mortgage, which contained a note that was signed the same day as the mortgage, which is not being appealed right here. There was also their intervention where they were asserting a lien on the real estate based upon that constructive trust case of 08-CH-649. So on February 18, 2001, the court dismissed one of the plaintiff's counterclaims but did, and this is First Cloverleaf Bank I'm referring to, but did state that they're, it did state a cause of action to potentially have an equitable claim based upon a constructive trust. Eventually on June 17, 2011, the court entered an order stating that the First Cloverleaf Bank did have an equitable lien on the real estate based upon the constructive trust case. At that point in time, they only found that Steve Gardner had a 50 percent, it was based upon the finding that Steve Gardner was the 50 percent beneficial holder of the land trust by virtue of Steve Gardner being the alter ego of Vega Homes. And at that point, we had already had a sale on everything. There was $9,800 left over. That sale surplus was then distributed, 50 percent of that was distributed to First Cloverleaf Bank. Later on, in the final order of the case, September 4, 2012, the court entered the same findings in relation to T.M. and Gardner and the remaining 50 percent was distributed. What we're here appealing when we think the court had error was, initially, was that finding that the First Cloverleaf Bank held an equitable lien on the actual real estate based upon the constructive trust case. Now, we've obviously just spent the previous time arguing that case, and it's the same issue. We believe that at best, at best, Steve and T.M. Gardner were beneficiaries of the land trust. Obviously, we don't see that they were, but they were beneficiaries, and even if they did, as beneficiaries, at best, they hold a personal property interest, which did not create a lien on that real estate. So we feel the court was in error by making that finding for the reasons stated in the constructive trust case. The briefing in this case, these two cases, as you can imagine, was a lot of crossing over, and we had arguments on the same day. So the arguments presented on that, so unless the court had any questions specific to the constructive trust issue, I will stand on my previous arguments and agree on that. I do have a question. I haven't seen the record. The constructive trust you're claiming then should have been a constructive trust for the personal property or the beneficial interest, right? Yes. So if your constructive trust argument that you made 10 minutes ago prevails, what happens to the money? What happens to the money, the sales surplus? The money would then go, and that's the next issue, would go to the owner of the equity of redemption from the sale, from the foreclosure case, which would be the land trust. Now, what happens to it from there? Well, that depends on what stage we're at in terms of the collection proceedings and the ancillary matters. It would go to the land trust. If there's been a citation served on the land trust in those other cases, which there has been, then the land trust, even if the beneficiaries come to distribute it, distribute it at their own risk, because if they do distribute it and the court determines that, no, that belonged to Steve and Tammy Gardner, and they have judgments against them and we have a citation, then the bank is protected because they can go out to the trustee and the trustee will serve the citation to discover assets. So there's other collection actions that the bank can do to try to protect that and prevent it from getting distributed out. Could they ask for constructive trust over the land trust? Let the money be held in constructive trust for the bank? Yes, they could. So really what you're saying is the process is wrong here. The procedure is wrong. Correct. But ultimately the bank may get the money anyway. Ultimately. I mean, I don't know who else they owe or, you know, what other issues are out there. I've said this in front of Judge Harrison multiple times here is that, you know, the bank very well may be able to ultimately get the money, but they have to follow certain procedures that are set up by Illinois law. And in my opinion, what the judge erred is Justice Harrison said, you know what, this is equity court. I can collapse all this stuff. And he just did it and he got to a result, but the means needed to go through a different process. And I feel that, you know, that's what the appellate court obviously is here, that it's trial courts and everything, and I know, Your Honor, since you've been in trial court or tried many cases, is that, you know, it's a different animal when you're dealing with a trial court, but what we're here at the appellate court to submit is more of a jurisprudence type of thing, which I tend to like, but it's analyzing the issues that the trial court sometimes doesn't get. So I don't regret Justice Harrison, obviously, because it was a very complicated and convoluted set of facts. But the fact is that at best they had a personal property interest, and as a personal property interest, that doesn't translate into a lien on real estate. If you did, then what would be the point of Illinois land trust law? Because in essence, what they're able to do here is create an equitable mortgage, and then they get the right to file a lien in the foreclosure case, 1466. And there's a case law that talks about the difference of equitable mortgages and security interests, or personal property interests, and the focus is always on the intent of the parties at the time of executing it. And we've gone through it. The November 21, 2003 mortgage is a great illustration of what an equitable mortgage is and what a security interest is. On November 21, 2003, you had a note signed that day. You had a mortgage paper that day that specifically lists 20, 20, 12 quarters you drive. And that mortgage says, you're pledging this to secure that note. The court, and there's a case law that says a beneficiary can buy the land trust, and that won't make a legal mortgage, but it'll make an equitable mortgage. Contrast that with the claim for the additional 450, which Dell deals with, which is origins, is the October 6, 2006 commercial guarantee. Because prime development, note one, the only reason why the gardeners are on the hook for it is because they guarantee prime development, or that's the argument. Take that. That guarantee did not include a mortgage. It did not include a note that identified, or any type of document that identifies specifically 20, 20, 12 quarters you drive. It doesn't say, hey, I'm going to pledge this to secure that. And Justice Harrison is absolutely correct. You can read it in one of the transcripts when he posited it to me. He said, well, Mr. Sturgeon, you're trying to go for receipt, which the bank would be happy with because then they get the money back. He goes, so your relief you're requesting isn't necessarily what I can give you. If I give you a decision and say it's no good and there's no foreclosure, then you've got to pay all the money back. Where does that get you? Because your clients are in a position, if they were in a position to pay, they would take it. And he said, no. That's why the November 21, 2003 is an equitable mortgage. If you've got something, you can't just use it without paying your obligations. That October 6 one is a completely different factor. So that's why our position is that they have a beneficial interest, which is personal property, which is not a lien on the real estate. So if they don't have a lien on the real estate, then they can't be the owner of the equity of redemption and get that property. There was a surplus. Amazingly, with all the debts and all the money we're talking about here, amazingly, they were able to sell this property and pay off everything. There was taxes outstanding for two years. There was four mortgage holders. There was a mechanic lien. And they were able to pay $57,000 in attorney fees, plus the attorney fees of the associate bank, the first counselor bank. So there was still $9,800 left, but everybody had been satisfied to have any particular lien on it. So my position is that based upon that, what's left? Well, what's left is the owner of equity of redemption, which is the land trust. It goes to the land trust. As Justice Kagan pointed out, they may not have been able to just turn around and just quickly distribute it out to whoever they wanted, but that was for a different process that the bank could have done to protect themselves. Just because the bank wants to skip those debts doesn't mean they should be legally entitled to skip those debts. Now, specific to the attorney fees issues that I mentioned before. Let me back up one thing. I spoke about that equity of mortgage and the security interest thing. I want to point out those factors because I spoke about the intent. And the factors that the Melrose case involved was, did the land trust obtain the vision for the sale of real estate upon the clause? This land trust did not. Was the purpose of setting up the land trust the first security loan? No. October 2, November 21, 2003 may have been. That's why if you look at these factors in that one, an equity of mortgage may have justified leaving the bond. If you look at them in the October 6, guaranteed, it's a different question. The timing of the creation of the land trust, the type of pledge. The land trust was created 14 years prior to 2006. So I don't think anybody can reasonably look at this and say this is an equity of mortgage. You notice Justice Harrison didn't call it an equity of mortgage, he called it an equity of lien. But what's the difference between an equity of lien on real estate and an equity of mortgage? The effect is the same. The practicality is the same. We're just using a different word. So in that regard, we believe 9,800 should go to the owner of redemption. Now on the attorney's fees, there's two issues in there. We all know it follows the American rule. Unless there's a statutory or fee-shifting provision on a contract, you're not going to be able to collect.  In this case, the provision is section 22 of the mortgage, November 21, 2003 mortgage document. And, you know, that was found to be an equity of mortgage. I'll submit to the court that, you know, since it's not a legal mortgage, that that provision, the trial court is certainly within its discretion, and this is an abuse of discretion standard, not a de novo, is within its discretion to say, you know what, I found this based upon equity. I can also find based upon equity that you're not entitled to recover attorney's fees in this particular matter. And in this case, we think, you know, I put in my brief briefly that we've, I think that that warrants consideration in this case, because, you know, the bank, and I'm not talking necessarily about First Global, because it was the predecessor, was First Federal was the one that actually did the loan. You know, they drafted the documents. They knew it was a trustee. They never bothered to get the trustee. They never bothered to have the signature. They didn't bother. So I would submit, you know, they had some unclean hands there, and they shouldn't necessarily benefit from that. Now, specific to the amount of the attorney's fees, if the court feels that the trial court did not produce a discretion in finding that fees were warranted, you know, the parties seeking the fees clearly bear the burden to find that the fees and costs were reasonable and warranted. There's no dispute in terms of like the hourly rate or anything like that, that they're reasonable. There was no dispute necessarily that Mr. Burkhart did all the work that was listed in his application for fees. But we did raise the issue and highlight it for the trial court that some of those fees were related to other cases, specifically the 649 case, which we were just here on. There was entries in there that were specifically related to discovery, written discovery. In 649, we actually obtained written discovery. There was never one discovery propounded upon any party in 1466. So even if you find that the mortgage is a basis for fees, it's got to be related to that collection. It's almost, it was interesting listening to the arguments in the first case dealing with the national title issues, that, you know, there were so many moving parts here and so many hats that the First Poverty Relief Bank was doing that you've got to keep track of it. You can't just throw them all together for the fee. It's that there was the action of prosecuting the mortgage. If the mortgage, if that's the basis of fees, the related actions for prosecuting that mortgage in 1466 are recoverable. If the court finds that the provision in section 22 of the mortgage is blocked. Pursuing crime development, doing citations to discover assets in those five other cases that result in a judgment, that's not related to prosecuting the mortgage. That section 22 gives you the right to collect and prosecute the mortgage. That's not related to that. The constructive trust case, which they're trying to collect the monies above and beyond the November 21st, 2003, that's not related to prosecuting that. The suit against national land title, which I wasn't a part of, that's not related. And I know counsel said, well, you never asked for an evidentiary hearing. Justice Harrison, in the record, did say, do we need to put Mr. Burkhardt on the stand? My position at that point in time is that there was no dispute what was done for what. It was just whether or not you were legally entitled to do it. And I think that, first of all, we've met barriers that have occurred. I objected, raised the specter that all these entries are clearly not related to this case. It's now their burden to present further evidence that somehow they are related to the case. And in that regard, I do think that either the award of fees is too high or more appropriately, it would need to be remanded for an evidentiary hearing on the fees so that the trial court actually gets the evidence to actually consider what entry was for what. Because, I mean, we've got a lot of fees in this case. This was not your typical foreclosure case. And it's a large monetary amount. So, if I check my notes here one second and make sure I didn't overlook anything. Unless there's any questions, that's all I have right now. I don't believe there are.  Thank you, Counsel. Your Honor, both counsels appearing before my opponents today suggested that I should get a flat indicating that I argued three in a row on the same day. You've won your endurance award. We'll take judicial notice of that. Thank you. You know, counsel mentioned that there were a lot of hats moving around and he really didn't know which lawyer to talk to on behalf of the First Global League Bank. I'd like to elaborate on that a little bit. I'm sure you've heard that in this appeal, this particular issue, the foreclosure case, I received a coverage letter from the National Land and Tile Insurance Company saying they had sent full defense. They were going to stand in and defend me. And it's kind of ironic that I'm standing here now and I got the notice of appeal. It indicated to me that the Garner entities were going to be contesting not only the orders that it briefed on, but also the March 10th order actually finding that there was an equitable mortgage on this property because its position in trial was that there shouldn't be. The mortgage should be destroyed and declared invalid. Total, in which case I was kind of in a position of I really didn't know what to do with it, frankly, because if, as I said earlier, if that happens, that triggers liability under the title insurance policy. We get paid $470,000 on the policy and then that frees up a whole actual lot of equity because the title company simply stands in our shoes and has the money out of the sea playing against the Garners on the loan. By the way, the loan, and you don't have the record, the note of the $470,000 was signed only by Steve and Tammy Garner. The mortgage was drafted by a first federal savings and loan, and it was in the name of the land trust. With the letter of direction to the title company to have it executed properly, and it was, in fact, the title company who botched the execution. It was not the first federal. So this idea of the fact that the first federal drafted the documents, that rule that it should be somehow construed against the first federal, it's not in play here. The first federal handed it off to the title company, and the title company admittedly botched the execution of this particular thing. Was there any duty of supervision or check to ratification? Not under those circumstances because a followable policy was then issued. In fact, the commitment that was issued from Guaranteed Title, which closed the transaction, which was writing policies for National Land Title at the time, had a sheet saying these are the requirements that need to be done before we will insure this mortgage. One of them was to have it properly executed by the land trustee. And so we gave that back to the title company with the insurance from them that they were going to get that done. It was a mistake. It happens. That's why you get title insurance, so that if that mistake happened. And I was kind of expecting I'd get up. I was kind of glad that National Land Title hired Mr. Damien at first to write this, to defend this appeal, because I was having a terrible time of conflicts trying to figure out, well, if they abandoned me, why don't I just come up here and say he should win? And, you know, the mortgage should be wiped out because then that triggers payment from the title company to me, to my client in the fourth sector, we would actually be in a better position. And that gets back to the old idea that we'd be fifth in line. And number one, having been destroyed, they'll be plenty of money to take care of 3, 4, 2, 3, 4, and 5, or at least a great deal of 5, because it was a $675,000 sale. So there was plenty of equity. Mr. Burkhart, I have a question. I think you're talking about the first case. I want to ask a question about this third case. Okay. The award of attorney fees that you received in this case was for the $450,000 you were attempting to collect. Is that true? No. Okay. I segregated out the three cases that I had, and I submitted that proof to the judge in support of my affidavit. And I had that ability on my billing program to do that. When I worked on cases that dealt with the constructive trust case, the $450,000, those were not included in the amount of fees that were awarded in the foreclosure case, because those were properly segregated out. Now, counsel refers to maybe three or four entries that he has questions about, Mr. Burkhart, and believe me, that's a lot of entries there for a $50,000 fee. They're only going to have a couple of them that he has questions about. I think Judge Harrison exercised his discretion and saw that some of these entries might or might not be, or maybe Mr. Burkhart made a mistake on one of them, but maybe he didn't bill, and there were just as many mistakes where he should have billed for this foreclosure suit, and he left them over here in the constructive trust case. He got to see all of that. Okay. So there was, you're admitting that there were a few entries that might have gotten? No. Okay. I'll take that up. That was one of the points I had written down. Okay. I have one other question. Okay. If, however, Judge Harrison had not declared this an equitable mortgage or an equitable lien and instead had declared it a personal asset of the land trust, you would agree that no attorney fees could be awarded under Illinois law or not? I'm trying to follow the question. If he would have declared that it was not? It was a personal property interest of the land trust, and there would have been no equitable mortgage kind of issue. Do you accept Mr. Yusur's argument? Would you also agree that there would be no payment of attorney fees under that scenario? Under the American law? I haven't thought of it, and I don't know that I can definitively say that. I would try to argue. That's okay. I'm just wondering what you think. What I think is that I would have to study it in terms of the mortgage agreement. But that's saying there is no mortgage. Right. Okay. But I think, I don't know if I can gain some benefit out of it or not, but the Melrose Park case was cited, talking about this UCC Article 9 stuff, and I rebutted that at page 18 of my briefing. And I think that what the court in Melrose Park said was that we do not think that the Supreme Court created any hard and fast tests in a couple of cases it cited, but rather set forth guidelines which may be used to garner the intent of the parties in the trust interest. And we believe the facts in each case must be considered together, and the court must decide whether on balance the facts are more indicative of an intent to create a personal property, security interest, or the intent to create an equitable mortgage. I would suggest that under these circumstances, the court is perfectly okay with declaring an inequitable mortgage and enforcing an as written, which includes an attorney fee provision that says we're entitled to get it. Second, there's the mortgage foreclosure act. I'm not sure that we wouldn't be able to bring this transaction, so I'm just talking to you about the types of fees. There's a section in the statute that allows you to gain your fees. But I'm talking about the extra money that was due, the $450,000 that was put into constructive trust. I'm not talking about the mortgage. I'm talking about the number five position. Okay. Oh, so if the constructive trust case, instead of ruling that it was a constructive trust on the property, then the court said, well, it's really only a personal property interest, whether attorney's fees. See, attorney's fees weren't awarded in the constructive trust case. There wasn't enough money to pay the attorney's fees. Okay, so the only fees you got paid on were the first foreclosure fees. Okay, I misunderstood. Thank you. Okay, so. Okay, thank you. I hope I don't hear that. Yeah, you clarified that. Thank you very much. I was talking about this argument about unclean hands and stuff. The bank has clean hands. If a bank can't rely on a title company where it's getting title insurance, and then the title company subsequently issues that title insurance insuring the mortgage, the banks aren't going to be able to do business. So there's no issue of attorney's fees. Can we go back to the issue on piercing the corporate veil? Yes, sir. There's eight factors, obviously. We all agree on that. And it's not just who owns it. So how did the trial court come to a conclusion without any evidence that the corporate veil should be pierced? I believe the court's exchange at the record, it's R57, line 12 through R60, line 18, appears at page 18 through 20 of the brief. In this case, the foreclosure case, the court went into quite lengthy exchange explaining it. Would you like me to read through it? No, it's in the room. Okay. But that, I submit, is the basis of the rulings of the court. And like I said, we briefed it in the brief. In any event, this is an appeal of a foreclosure ruling. The main ruling in this case has nothing to do with the constructive trust case. The ruling in this case, what the issues are in this case before this court, is whether or not the mortgage should have been enforced as written, and whether under the circumstances it was appropriate to declare that the mortgage, the $470,000 mortgage, should have been paid off. Well, you know, they failed to argue that in their brief. And so I don't really know why we're here. And the only thing I can glean from the brief is that this whole dispute is over the $9,800 that was left over, which ultimately was sent to us because we were ruled to be the constructive trustees in the constructive trust case. So I'm really not clear exactly how this would work. In fact, I even suggested to my wife and co-counsel that she writes the briefs. I'm just using the arguments. Maybe I should just get up here and say, go ahead, wipe out my mortgage. But I don't think I can do that under the cooperation clause in the policy. I have a duty to cooperate. These all blend together. A lot of that kind of comes into effect with regard to some of the arguments that we never once argued that the mortgage should not be enforced. We most certainly did. We were granted leave to file our own counterclaim. We got to sue ourselves, basically. And these cases where you have second mortgages or subordinate interest, there's cases where that actually happens, where the bank has to file a counterclaim against itself to try and enforce, say, a subordinate second mortgage that they use. Okay. That's the position we were in. And Judge Harrison granted us leave to file a counterclaim to enforce our less pendants in these foreclosures. And so we were number five. And in fact, he ruled that the net proceeds, and I guess that's what the issues are here, that $9,800 should be distributed pursuant to the Mortgage Foreclosure Act to us as number five. So that's the rulings of the case. The evidence supported it. The attachments to the motions supported it. And I believe Judge Harrison was correct in making that determination. That does shed light on, I think, hammered again, I don't mean to be repetitive, on the fact that we were being harmed for every dollar that's spent in this mortgage foreclosure suit. We were being harmed in our equity rights to the constructive trust case that Judge Harrison eventually said, yes, you're going to get these sales proceeds. So the issue here is statutory in nature because under the Mortgage Foreclosure Law, the judge has to say and determine the priorities of the sales proceeds. And he basically took judicial notice of the findings that he made in the constructive trust case that, yes, in fact, this $9,800 was raised at that constructive trust, and it ultimately goes to first closure of the bank. I believe that was a correct decision. I've cited some cases that people have just did. But one other one, there is a case, the Payne-Wetzel Association versus Gittles case, and it basically said that a beneficiary of an Illinois land trust, when acting in its capacity as a beneficiary, may enter into a valid contract affecting the title of the trust property if the trust agreement vests him with the sole right to direct the trustee to take the title. That's what was going on in this trust. They had that authority. The guarantors. But it was once removed because the beneficiary of the land trust was MEGA Construction. Right. Who was ultimately? It was MEGA Construction under your reading of this case law. That's another issue that does come up in the brief. The trust, a careful reading of the trust, I'm not sure it names MEGA as the beneficiary. This is the wording that was used. The trust says that MEGA Construction Inc. is the entity that the land trust designates as, quote, the person entitled to the earnings, avails, and proceeds of the real estate. That doesn't say if you're the trustee or if you're the beneficiary. So what I'm getting at is there was some question here as to who the beneficiary were. What it does say is that certain people are given the power to direct the trustee, and then they're not named. So the trust is a little ambiguous on who those people are. But ultimately, given all the circumstances, Judge Harrison ruled that it's Tammy and Steve Gardner. They are the ones that have the power to direct this trustee. What was the evidence of that? They've been doing it all along. They're the ones that signed the letters of directions, and we had a stack of those that the judge saw. The letters of directions telling Schutzenhofer, who was the lady that was the trustee in the Bank of Edwardsville, directing her to sign this mortgage, directing her to convey this land. All those letters of directions were signed by Tammy Gardner. So there are plenty of evidence to suggest they were the beneficiaries themselves, not necessarily Megastruction. Megastruction was just somebody, a holding company, to whom, and that's the quote, they are entitled to the earnings, avails, and proceeds of the real estate. Was that raised at the trial court level, that there was confusion as to who the beneficiary was? Yes, in the briefs. Yes, it was. We just copied this argument from our briefs at the trial court. Is that a question of fact that avoids summary judgment? Not if you find that the Gardners are the actual beneficiaries, and that they do have the power to direct. And that was the exchange I talked about earlier. I don't want to repeat it, but the court was having an exchange with Mr. DeSouza, and he basically agreed with the court that ultimately, as I think you just did here, that ultimately the banks are going to get the money. Ultimately, the only people making direction here is Steve and Tammy Gardner. And it was just, frankly, it was as clear as anything, and that's why the court made that statement when he made the ruling. Under no circumstances can it be anything else. It's as clear as there can be that this is the case where Steve and Tammy Gardner are the ultimate ego of Mega, whatever you want to call it, Mega construction, Mega ink, Mega Steve Gardner construction, whatever. They're the ones that are truly running. And if you think about it, this is more of a case of substance over form. And the only thing that's being done here that's clear is that the Gardners are trying to hide or shield assets, and they knew that they owed those moneys to the cooperative bank. And if there was a case cited in my brief that talks about that circumstance, I think it's the Podvinek versus Popov, where a bank that was in the position of the trustee was held responsible for monies that came into their hands, and where then they released, it's almost exactly like this case, where they released it to somebody who under the circumstances of their trust agreement would be entitled to those proceeds. Well, somebody, the Popov, Podvinek, held a $57,000 judgment against this Popov, served him with a citation to discover assets, and subsequently had a judicial lien filed in the case that LaSalle was judged to owe Popov some money. Why would you file that in that case? You said they spread it upon the record. That created a lien in this other case. And so when the bank, when they settled that case, LaSalle went ahead and paid out the settlement, but didn't pay any attention to the lien that Podvinek had, and they were held liable, the Supreme Court upheld the trial court's judgment against that bank for distributing those proceeds without taking care of that lien. Similar situation that we have here. And I did want to correct one statement. I may have misheard, but I think counsel said there were no citations issued on the trust in this case. Yes, there were. Ms. Chutenoff was cited to the court, and she gave a citation to Don Metzger, the attorney to the bank president, and we discovered quite a bit of it. And she was basically saying the same thing, but the only people who didn't have it were her as the trustee or Steve Jane Carter. Unless there's other questions, I think I'm done. I don't believe there are. Thank you, counsel. Counsel? Thank you, Your Honor. It's interesting he brings up the Podvinek versus Popoff case, because you know why they went after Popoff with money for that settlement? Because there was a citation to discover assets from the previous judgment prior to the distribution of the funds in the settlement. So the defendant in the settlement. So Podvinek had a judgment. Again, Popoff had another case. They served a citation to discover assets. They settled that case. Things were distributed, and the court said, no way. You were on notice of that case. You had a citation. You're good for it. The interesting thing on that case, and what they wouldn't cite it for in the brief, is just that the true owners of the land trust was a beneficiary. Well, the interesting thing is what they held on in that case. Ultimately, the trustee was not held to owe anything, because they said Podvinek could only stand in the same shoes as Popoff, and Popoff could never get it from the trustee, even though they were the beneficiary. So they couldn't. Podvinek's price, the settlement, the judgment, Popoff could not increase its position with Popoff. So that's just interesting, because it's kind of what I think I was saying you could do in order to protect yourself, is that you've still got to go through the process. Your Honor, just in case, you mentioned something about the fusion of the beneficiaries of MAGA and the gardeners, and I know counsel said it's unclear. Well, the signature page, which is on C-507 in the record of the land trust, says, on said day, the said beneficiaries have signed this declaration of trust and trust agreement in order to signify the assent to the terms hereof. And it's got a signature on it. MAGA Construction Inc. doing business with Gardner Homes by Steve Gardner, the president. There's no individual signature for Steve and Tammy Gardner. There's no mention of Steve and Tammy Gardner in there, other than in the president and secretary role. There's the whole harmless on the next page, but they have them signed individually. But that page doesn't say that they don't assume any more beneficiaries. Justice Harrison wasn't confused as to who the beneficiary was. He just ruled that MAGA Homes, that Steve and Tammy Gardner were the author, even, so they still were beneficiaries. And that's what this order stated. And briefly on a couple of the things. You know, Mr. Burkhart said that the Gardners tried to hide their assets and shield their assets. Well, the land trust was created in 1992. The property was in the land trust the whole time. I doubt that they could foresee 16 years later that the housing market and the business they were in would crash. If so, I think they may have made some adjustments prior to losing everything, just about, that they had. So I think that that's – I mean, we dealt with the fact that they were given. It was in a land trust. And the only thing that was assigned was the beneficial interest. And in my position, I don't even think the beneficial interest was assigned. It was the shares of MAGA Construction. That was the personal property. Now, if the court ultimately hears this, the court prevails and finds that the Gardners are the author, you still only get a beneficial interest, which is personal property, which does not create a lien on the corpus of the trust. And that, in essence, is what it comes down to on both cases, both the 649 and then the 649, which forms the basis. Because it's interesting. If you look at the complaint, Mr. Perkar said, we came to enforce the list of pendants. Well, I thought the list of pendants wasn't a lien. So what are we enforcing? I thought the dispenser just knows. Their actual counterclaim actually lives. What is your mortgage? As you see, there's a standard boilerplate complaints in the statutory lease and mortgage proposals, and they list all those things. Paragraph 3, I think, has 15 letters, subparagraphs to it. One of them is, what's your instrument? And it lists the list of pendants. So that's what they do. That's the basis of their lien to get the access to Salesforce. And I don't think if 649, if they didn't have a lien in the real estate, that doesn't translate to building on the real estate. Any questions? I don't think so. Thank you, counsel. Thank you all for your time. We appreciate the briefs and arguments of counsel. All the briefs and all the arguments. And we will take the case under advisement. Thank you.